UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER CARPENTER,

                  Plaintiff,

    -against-

CITY OF MOUNT VERNON, MAYOR ERNEST
D. DAVIS, COMMISSIONER TERRANCE
RAYNOR, CHIEF JAMES M. DUMSER,
DEPUTY COMMISSIONER RICHARD BURKE,
CAPTAIN MICHAEL GOLDMAN,
LIEUTENANT MARIO CURZIO, and
LIEUTENANT JOSEPH HUNCE, in their official
and individual capacities,

                  Defendants.

15-cv-0661 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

       Plaintiff Jennifer Carpenter brings this action against Defendants City of Mount Vernon,

Mayor Ernest D. Davis,[1] Commissioner Terrance Raynor, Chief James M. Dumser, Deputy

Commissioner Richard Burke, Captain Michael Goldman, Lieutenant Mario Curzio, and

Lieutenant Joseph Hunce, in their official and individual capacities alleging claims of: (1) gender

discrimination under the 14th Amendment, pursuant to 42 U.S.C. § 1983; (2) gender

discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e–17 ("Title VII"); (3) gender discrimination, retaliation, and disability discrimination

under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290–97; and

---

[1] Plaintiff's spell Mayor Ernest D. Davis's name 'Earnst,' while Defendant's spell it 'Earnest.' The correct spelling – 'Ernest' – is reflected in this opinion's caption.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/27/2016

(4) disability discrimination and retaliation claims under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112–12117 (the "ADA").

Before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint. For the following reasons, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are taken from Plaintiff's Second Amended Complaint ("SAC"), unless otherwise noted, and are accepted as true for purposes of this motion.

Plaintiff is a female employee of the Mount Vernon Police Department ("MVPD"). In December 2011, Plaintiff became the first African-American female promoted to Sergeant in the MVPD. (SAC ¶ 17.) Plaintiff asserts that no woman has ever held a rank above Sergeant, and at the time she was promoted she was the only female Sergeant out of 20 Sergeants in the MVPD. (*Id.*) In January 2012, Plaintiff was assigned to the MVPD's "Squad 3" as its patrol supervisor. (*Id.* ¶ 19.) Plaintiff alleges that since her promotion, members of the MVPD have mistreated her "on account of her gender," as well as "retaliated against [her] due to her opposition to discriminatory practices." (*Id.*)

Plaintiff sets forth the following instances of mistreatment and/or disparate treatment on account of her gender or her purported opposition to discriminatory practices:

(1) During Plaintiff's first roll call after being assigned to Squad 3 she was not introduced as the Squad's Sergeant by her supervisor, Lieutenant Nawrocki, whereas the previous male Sergeant of Squad 3 was introduced during his first roll call (*Id.* ¶ 19);

(2) In October 2013, Lieutenant Nawrocki told Plaintiff to "control her emotions" (*Id.* ¶ 22);

(3) On January 31, 2014, Plaintiff submitted several requests for training, including search warrant training. Plaintiff's requests were purportedly denied because such trainings typically were not intended for supervisors. Nevertheless, other male supervisors attended these trainings (*Id.* ¶ 25);

(4) On February 4, 2014, Plaintiff was informed that Chief Dumser did not want her to be physically present at Headquarters, while male employees were not similarly rebuked (*Id.* ¶ 26);

(5) Between March 1 and April 5, 2014, Plaintiff was not permitted to conduct roll calls. She was the only supervisory officer who was not permitted to conduct roll calls (*Id.* ¶ 31);

(6) On March 9, 2014, Plaintiff requested to attend three training sessions but never received a response. Other male Sergeants were permitted to attend the trainings (*Id.* ¶ 32);

(7) In April 2014, Plaintiff was ordered to report to Headquarters after her injury to meet with a doctor whereas other white male officers injured on-the-job were not ordered to report to Headquarters or were given transportation (*Id.* ¶ 36); and

(8) In May 2014, Plaintiff was denied 207-c benefits whereas male officers who suffered on the job injuries and did not oppose discriminatory practices were granted 207-c benefits (*Id.* ¶¶ 43 and 54).

Plaintiff also alleges that she complained multiple times, verbally and in writing, to her superiors about discriminatory practices and behavior in the MVPD. Following Lieutenant Nawrocki's comment to Plaintiff that she should "control her emotions," Plaintiff immediately complained to Nawrocki that such "treatment was 'sexist.'" (*Id.* ¶ 22.) On December 9, 2013, Plaintiff sent a written complaint to Commissioner Raynor alleging that Lieutenant Hunce was discriminating against her on account of her gender. (*Id.* ¶ 23.) Specifically, Plaintiff stated that as the only female supervisor she was being treated differently than her male counterparts. (*Id.*) Plaintiff believes that these claims were never investigated. (*Id.*) On January 17, 2014, Plaintiff visited Mayor Davis at his office and complained that she was being treated differently based on her gender and race,[2] and specifically that black officers were subject to different treatment than white officers, who were permitted to engage in misconduct without repercussions. (*Id.* ¶ 24.)

---

[2] This appears to be the only allegation of race based discrimination and as it is only a conclusory summary, Plaintiff has not alleged any race based claims in the SAC.

During this visit, Plaintiff alleges that Mayor Davis inappropriately asked her if she was sleeping with Commissioner Raynor. (*Id*. ¶ 24.)

On February 4, 2014, after Plaintiff was informed by Lieutenant Curzio that she was not to be physically present at the MVPD Headquarters, she verbally complained to Lieutenant Curzio, arguing that it was a "double standard" because male employees "could be seen at any given time sitting around chatting inside for hours and Dumser never appeare[d] to order them outside." (*Id*. ¶ 27.) Plaintiff returned to Headquarters two days later. Immediately upon entering Headquarters, Plaintiff was followed by Lieutenant Curzio, who repeatedly reminded her that Chief Dumser did not want her inside Headquarters. (*Id*. ¶ 28.) Plaintiff immediately complained about this treatment to Lieutenant Curzio and informed Human Resources. (*Id*. ¶ 28.) Following this incident, Plaintiff "took sick leave from February 7, 2014 through February 26, 2014 as a result of the undue stress . . . caused by the gender discrimination and retaliation." (*Id*. ¶ 29.)

On February 7, 2014, Plaintiff filed a complaint with Human Resources Commissioner Williams relating the above instances of purported discrimination. Specifically, Plaintiff complained of the following: Lieutenant Hunce threatened her for writing up a white female officer who was sleeping on the job; she was the only supervisor being followed around; all other male supervisors were permitted to stay at Headquarters; she had been called derogatory names relating to her gender; and Lieutenant Hunce demonstrated that he was committed to targeting her. (*Id*. ¶ 30.) Plaintiff never received a response to this complaint and believes no investigation was undertaken. (*Id*. ¶ 30.)

Plaintiff returned to work on March 1, 2014, but was not permitted to conduct roll calls until April 5, 2014. (*Id*. ¶ 31.) On March 9, 2014, Plaintiff requested to attend three training

sessions with no response. Other male Sergeants were permitted to attend these trainings. (*Id.* ¶ 32.)

On March 14, 2014, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging race and gender discrimination, as well as retaliation. (*Id.* ¶ 33.)

On April 14, 2014, Plaintiff alleges that she fell at Headquarters while retrieving her memo book on the orders of Lieutenant Curzio and sustained an injury to her knee, which was diagnosed as a torn meniscus. (*Id.* ¶ 34.) Lieutenant Curzio expressed no sympathy for her injury and "hostilely" inquired about the location of her memo book. *Id.* Plaintiff took sick leave the next day due to her injury. (*Id.* ¶ 35.)

On April 23, 2014, Plaintiff was ordered to report to Headquarters to meet with a doctor despite her limited mobility. (*Id.* ¶ 36.) Plaintiff explained that transportation was challenging given her limited mobility, but Chief Dumser told her it was "her problem" to arrange transportation. White male officers injured on-the-job were either not required to report to Headquarters or were provided with transportation. (*Id.*) Upon reporting to Headquarters, the doctor did not examine Plaintiff, instead only speaking to her for 10 minutes, which Plaintiff argues could have been conducted over the phone. (*Id.* ¶ 36.)

On April 29, 2014, Captain Goldman informed Plaintiff that she was "designated [a] chronic absentee" and was thus forced to use her sick days while on leave, whereas other male officers were granted paid leave and benefits pursuant to General Municipalities Law 207-c after suffering on-the-job injuries. (*Id.* ¶ 37.)

On May 7, 2014, Plaintiff complained to Police Benevolence Association President Addison about her designation as a chronic absentee. She never received a response and believes that the PBA never conducted an investigation. (*Id*. ¶ 38.)

On May 9, 2014, Plaintiff's attorney served a Notice of Claim concerning the alleged discrimination. (*Id*. ¶ 39.) On May 12, 2014, Plaintiff's 207-c benefits were denied because "no request for 207-c status has been made." (*Id*. ¶ 40.) However, the letter also notes that Plaintiff's "recent request for GML 207-c benefits" had been received. (*Id*.) Three days later, Plaintiff called Lieutenant Nawrocki, who confirmed that Plaintiff had provided the required materials for her claim. (*Id*. ¶ 41.)

On May 15, 2014, Plaintiff filed an appeal of the denial with Commissioner Raynor and received no response. (*Id*. ¶ 44.) On June 2, 2014, Plaintiff exhausted her sick days. (*Id*. ¶ 45.) On the same day, she also complained to PBA President Addison about these denials and the disparate treatment she was receiving. (*Id*.) On June 18, 2014, Captain Goldman reiterated the denial of benefits to Plaintiff in a letter and informed her that her appeal was being held in abeyance. (*Id*. ¶ 46.)

In June and July 2014, Plaintiff sent letters to Captain Goldman, a Mount Vernon City Council Member, her PBA President, and others seeking an update on her request for benefits. (*Id*. ¶¶ 47, 49-52.)

On July 17, 2014, Commissioner Raynor accused Plaintiff of being mentally unfit for duty and ordered her to be examined by a psychologist. (*Id*. ¶ 48.) The psychologist told her that she was "definitely not mentally ill." (*Id*.) Similarly situated employees who did not oppose the MVPD's discriminatory practices were purportedly not required to undergo mental examinations. (*Id*.)

On August 22, 2014, Plaintiff sent a third request to Commissioner Raynor for 207-c benefits. (*Id*. ¶ 52.) Commissioner Raynor responded that she was denied benefits because she was not injured as a result of the performance of her duties and the injury was "idiopathic in nature." (*Id*. ¶ 53.) Plaintiff alleges that the injury was not idiopathic and occurred while on duty at Headquarters. (*Id*. ¶ 53.) Commissioner Raynor purportedly relied on MRI evidence to show the lack of a causal link between the injury and the performance of her duty. (*Id*. ¶ 55.) Plaintiff alleges that it is impossible to use an MRI for this purpose, and therefore the explanation is pretextual to hide a retaliatory motive. (*Id*.)

Currently, Plaintiff remains out of work on unpaid sick leave and has been attempting to secure benefits for surgery and a return to light duty status. (*Id*. ¶ 56.) On October 7, 2014 Plaintiff requested a return to light duty status with a note from her personal physician but was informed that there was no policy for return to light duty for a non-work related disability. (*Id*. ¶¶ 57-59.) The EEOC provided Plaintiff with right to sue letters, dated October 31, 2014 and April 1, 2015, in response to her complaints. (Id. ¶¶ 4-5.) Plaintiff's final appeal of her request for 207-c benefits has been denied on June 10, 2015 after a report and recommendation by Deputy Police Commissioner Richard Burke dated May 13, 2015. (*Id*. ¶¶ 61-64.) Plaintiff was also informed that Deputy Commissioner Burke subpoenaed Plaintiff's bank records, which Plaintiff alleges shows the City of Mount Vernon is now undertaking a retaliatory internal affairs investigation of her. (*Id*. ¶ 66.)

## STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, a court should accept as true all well-pleaded factual allegations, but should not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id*.

## DISCUSSION

### I.      Gender Discrimination Claims

Plaintiff's claims for gender discrimination under Title VII, the NYSHRL, and 42 U.S.C. § 1983 are analyzed under the *McDonnell-Douglas* burden-shifting framework. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 209 (E.D.N.Y. 2014) (internal citations omitted). *See also Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). Although Plaintiff need not establish a *prima facie* case[3] of discrimination under *McDonnell-Douglas* at the motion to dismiss stage, *see Christiansen v. Omnicom Grp., Inc.*, No. 15 Civ. 3440 (KPF), 2016 WL 951581, at *12 (S.D.N.Y. Mar. 9, 2016), Plaintiff's allegations "must be plausibly supported by facts [demonstrating] that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

---

[3] To establish a *prima facie* case of unlawful discrimination, Plaintiff must demonstrate that (1) she is a member of a protected class (2) who performed her job satisfactorily, (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 879 (2d Cir. 1997); *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09 Civ. 0977 (JFB) (ARL), 2012 WL 1038811, at *9 (E.D.N.Y. Mar. 28, 2012).

Defendants move to dismiss Plaintiff's gender discrimination claims for failure to sufficiently allege an adverse employment action. Plaintiff alleges that the denial of training, the order to leave the MVPD Headquarters, and the overall atmosphere at the MVPD, rise to the level of adverse employment actions necessary to sustain her gender discrimination claims. (Pl. Mem. in Opp'n to Mot. to Dismiss ("Pl. Opp'n Mem.") at 4-6.) The Court discusses each proffered action in turn.

A.    *Applicable Law*

In order to sustain a claim for gender discrimination under Title VII Plaintiff must sufficiently allege an adverse employment action because of the plaintiff's gender. *See Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007). These adverse actions must cause a "materially adverse change" in the terms and conditions of employment, and not just "mere inconvenience." *Id*. A materially adverse change includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).

A plaintiff's complaint at the pleading stage must "allege the essential elements of an employment discrimination claim," demonstrating that "plaintiff suffered discrimination on the basis of protected status that resulted in an 'adverse employment action.'" *Novak v. Waterfront Comm'n of New York Harbor*, No. 10 Civ. 9694 (PKC), 2011 WL 4946386, at *3 (S.D.N.Y. Oct. 17, 2011) (citing *Patane*, 508 F.3d at 112). A complaint "in an employment discrimination lawsuit need not contain specific facts establishing a prima facie case of discrimination, however, it must allege enough facts to state a claim to relief that is plausible on its face." *Allessi v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F. Supp. 3d 221, 226-27 (W.D.N.Y. 2014) (internal quotations omitted).

9

B.      *Denial of Training*

First, Plaintiff asserts that the denial of training satisfies the adverse action element of her prima facie case. Defendants assert that, while denial of training can be sufficient to show an adverse action, Plaintiff fails to show that the denial in the instant case caused material harm and therefore the denial does not rise to the level of an adverse action.

Inadequate training may comprise an adverse employment action but only in circumstances where an employer denies necessary job training to an employee and the terms and conditions of his employment are thereby harmed. *Eaton v. Wayne Cent. Sch. Dist.*, 25 F. Supp. 3d 370, 375 (W.D.N.Y. 2014). A relevant example demonstrating the requirements for showing material harm from denial of training, *i.e.* that the denial affects the employee's opportunities for career growth or the employee's compensation—such as failure to promote or loss of career advancement opportunities, is presented in *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336 (S.D.N.Y. 2006). In *Hill*, Plaintiff was found not to have suffered an adverse employment action from insufficient urinalysis training for her job as a Laboratory Associate because the plaintiff had "not produced any evidence she was materially harmed" by not receiving this training. *Id.* at 353-54. An example of a denial of training that harmed the conditions of employment by diminishing material responsibilities or opportunities can be found in *Cruz v. New York State Dep't of Corr. & Cmty. Supervision*, No. 13 Civ. 1335 (AJN), 2014 WL 2547541, at *5 (S.D.N.Y. 2014), where plaintiff was denied access to a training that was necessary for promotion to adjunct professor. In *Cruz*, the denial of training deprived the plaintiff of the material benefits of an opportunity to advance his career. *Id.* (training was a "stepping-stone towards becoming a full-time instructor").

Plaintiff alleges that she submitted several requests for training which were denied or did not receive a response, while male officers were permitted to attend these trainings. (SAC ¶¶ 25

and 32). In order for Plaintiff to show that it is plausible that she suffered material harm she must show that the denial in training caused her opportunities for career growth or compensation to be affected. *Hill*, 467 F. Supp. 2d at 352. However, Plaintiff fails to show any material harm from these denials. In contrast to *Cruz*, Plaintiff does not allege that the missed trainings limited her career advancement in any way. Plaintiff's allegations are more akin to *Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007), where the court did not find a diminishing of material responsibilities or opportunities. In *Patane*, a secretary who had virtually all secretarial functions removed from her responsibilities was found to not have been subjected to a materially adverse change in her responsibilities under a gender discrimination claim. *Id*. at 115. Thus, a denial of a "refresher" class (SAC ¶ 25) would similarly not meet the high threshold of an adverse change in Plaintiff's responsibilities as a Sergeant.

Plaintiff asserts that the denial of training was adverse because the training was "applicable to [Plaintiff's] job duties as Sergeant" (*see* Pl. Opp'n Mem. at 4), and cites to *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010). However, *La Grande* is distinguishable in this instance. Although training is a protected benefit under Title VII, *La Grande* held that "liberally construing the complaint, it was plausible that the [company's] alleged action was a *materially significant disadvantage* with respect to the terms of La Grande's employment, particularly if the training was 'part of the job' and barring him from the training diminished his *material responsibilities or opportunities*." *Id.* at 211 (emphasis added).

Plaintiff states only that the training was part of her job and may have aided her in supervising the execution of search warrants. (*See* Pl. Opp'n Mem. at 4.) However, Plaintiff does not state in her opposition to the motion to dismiss that supervising the execution of search warrants is material in any way to her employment. Plaintiff concedes that this training is a

"refresher" class. (SAC ¶ 25). And none of the trainings are alleged to be required for a promotion or to maintain Plaintiff's position. Therefore, even liberally construed in the light most favorable to the Plaintiff, she still fails to plead a basic element of her claim. Since the trainings were merely a "refresher" there is no allegation that Plaintiff's employment prospects were hindered in any way. *Id.*

Due to Plaintiff's failure to allege a materially significant disadvantage or change in material responsibilities or opportunities in employment, her allegations regarding the trainings do not constitute an adverse employment action.

C.       *Order to Leave Headquarters*

Next, Plaintiff alleges that her being ordered to leave Headquarters rises to the level of an adverse action. Defendants assert that, despite receiving this order, Plaintiff does not allege that it resulted in any negative consequences. Defendants classify the order to leave Headquarters as increased scrutiny, which absent "other negative results" has been found to not qualify as an adverse action. *Trachtenberg v. Dept. of Educ. of City of New York*, 937 F. Supp. 2d 460, 467 (S.D.N.Y. 2013) (collecting cases considering excessive or close monitoring of employees).

Plaintiff counters that her being ordered to leave Headquarters leads to the inference that Plaintiff was subjected to a disproportionately heavy workload, which adequately pleads an adverse employment action. Plaintiff relies on *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004), *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72 (2d Cir. 2015), and *Johnson v. Long Island University*, 58 F. Supp. 3d 211 (E.D.N.Y. 2014), for the proposition that an increase in workload is an adverse employment action much like the adverse action alleged here. Each of these cases can be distinguished from the case at hand.

*Feingold* is distinguishable because, there, the increase in the workload was directly against the employer's stated policy and thus indicated a pretextual rationale signaling

discrimination. *See Feingold*, 366 F.3d at 156. In the instant case there is no similarly stated policy against ordering employees out of Headquarters and so there is no similar adverse action. In *Vega*, the Court held that an increase in time spent preparing for classes without compensation was an increase in the workload and thus an adverse action. *See Vega*, 801 F.3d at 88 (also alleged to violate "District policy"). Yet there are no allegations of an increase in the total time Plaintiff worked in the instant case. *Johnson* similarly holds that an increase in amount of time that the employee was required to work was an adverse action due to the increase in workload. *See Johnson*, 58 F. Supp. 3d at 224 (seven "duty weeks" as compared to the norm of two weeks).

While Plaintiff's opposition to the motion to dismiss sets forth potentially negative consequences of being ordered outside, including an increase in field work and putting Plaintiff's life in danger more often, the cited paragraphs in the SAC (¶¶ 27-28) make no mention of such negative consequences. The SAC does not indicate Plaintiff worked beyond the typical requirement. "Where assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." *Johnson*, 58 F. Supp. 3d at 224 (citing *Williams v. Ford Motor Co.*, No. 12 Civ. 0411 (WMS), 2014 WL 1572302, at *13 (W.D.N.Y. Apr. 18, 2014) (collecting cases)). The SAC also fails to allege that the other officers worked less, conducted less field work, or put their lives in dangers less often. Plaintiff's only claim that this change in responsibilities was adverse is that the other "guys could be seen at any given time sitting around chatting inside for hours," (SAC ¶ 27), which is insufficient to show a "materially adverse" change in Plaintiff's working conditions. *See La Grande*, 370 F. App'x at 212.

The Court concludes that all of the potentially negative consequences set forth in Plaintiff's memo in opposition to the motion to dismiss are highly speculative; and regardless,

these consequences were not alleged in the SAC. Thus, Plaintiff fails to allege an adverse action based on a disproportionately heavy workload, vis-à-vis the order to leave Headquarters.

> D.      *Atmosphere of Adverse Actions*

Finally, Plaintiff argues that the totality of the conduct alleged to have occurred in the MVPD created an "atmosphere of adverse employment actions." (*See* Pl. Opp'n Mem. at 5.) Relying on *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002), which involved claims for retaliation, rather than discrimination, Plaintiff argues that the purportedly adverse actions detailed above, as well as the lack of investigation, denial of 207-c benefits, denial of light-duty status, ordered mental examination, and the alleged internal affairs investigation, created an atmosphere of adverse employment actions. In order to sustain a discrimination claim on this basis, the "seemingly minor incidents" alleged in the SAC must "reach a critical mass." *Id.* A critical mass can be met when the minor incidents create "a working environment unreasonably inferior to what would be considered normal for that position." *Id.* ("using an objective standard . . . the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical . . . workplace").

Plaintiff cites a number of cases in support of the application of the "atmosphere" theory to a discrimination claim to show that applying a retaliation claim's atmosphere theory to a discrimination claim is appropriate. The standard for a retaliation claim, however, is a lower standard for adverse action as compared to a discrimination claim. Plaintiff states that *Phillips*, 278 F.3d at 109,[4] which was decided in the retaliation context, also applies in the discrimination context because the distinction between standards for retaliation and discrimination set forth in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), were not yet created at

---

[4] *Phillips* clarified this Circuit's approach by borrowing language from the First Circuit's atmosphere standard as set forth in *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209 (1st Cir. 1989).

14

the time of the decision. Therefore Plaintiff claims that we should apply the atmosphere theory set out for a retaliation claim to a discrimination claim. Nevertheless, as there is currently a clear distinction between the standard to be applied to a discrimination claim as compared to the standard for a retaliation claim, the Court cannot lower the standard for Plaintiff. *Burlington* held that there should be a different standard for retaliation claims because discrimination claims "prevent injury to individuals based on who they are" whereas retaliation claims "prevent harm to individuals based on what they do." *Burlington Northern*, 548 U.S. at 63 (rejecting the limitation of actionable retaliation to so-called 'ultimate employment decisions'").

The rationale for this distinction remains for the present case. Thus, we must follow it and apply the appropriate standard to the claims before us. *See Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) ("To establish a hostile work environment claim under the Title VII framework, a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"); *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (allegations of an atmosphere demeaning to women did not establish a hostile working environment).

But even if we were to apply this more lenient standard, the conduct alleged would not meet the required threshold. The conduct alleged fails to meet the critical mass necessary to establish an adverse employment action because, taken together, Plaintiff does not allege that they created a working environment unreasonably inferior to what would be normal for that position, merely that the conditions were different.

Plaintiff alleges she was denied training that men were permitted to attend. While this shows a difference in treatment, it fails to show a material harm that came from this denial.

Plaintiff next alleges she was ordered to leave Headquarters while men were permitted to remain in Headquarters. Plaintiff again is only able to show a difference in treatment but fails to show any negative consequences that resulted from this difference in treatment. Finally, Plaintiff alleges that the totality of the actions in the MVPD created an atmosphere of adverse employment actions. While Plaintiff does allege, through these two actions and her other proffered examples, that there was a difference in treatment, she fails to show that an unreasonably inferior working environment was created. Her allegations fail to demonstrate discrimination on the part of her employer rather than simply disfavor, or dissatisfaction, coupled with a few discourteous incidents. Therefore, just as each action fails to meet the threshold required for an allegation of an adverse employment action, Plaintiff's generalized allegations of a hostile work environment are conclusory also, because Plaintiff fails to proffer any facts beyond the mere assertion that such an environment existed. *Twombly*, 550 U.S. at 555.

\*       \*       \*

Plaintiff sets forth several instances of different treatment but each of these instances is insufficient to allege a claim for gender discrimination. Having concluded that Plaintiff fails to sufficiently allege an adverse employment action or an atmosphere of adverse employment actions, Plaintiff's claims for gender discrimination under Section 1983, Title VII, and the NYSHRL are dismissed.

## II.   Retaliation Claim

Title VII prohibits any employer from discriminating against an employee because she "had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Plaintiff must prove that (1) she filed a good faith complaint of discrimination; (2) that the employer had knowledge of; (3) the employer took adverse

employment action against Plaintiff, and (4) there was a causal connection between Plaintiff's protected activity and Defendant's action. *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 277-78 (S.D.N.Y. 2000). Although Plaintiff must allege an adverse employment action to establish a retaliation claim under Title VII, the standard for an adverse employment action for retaliation claims, as already discussed, is substantially lower than discrimination claims. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). In retaliation claims, "[a]ctions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.*

Defendants' set forth the applicable law necessary to determine whether a Plaintiff states a claim for retaliation, but fail to explain in any way how the SAC does not meet this standard. (*See* Defs. Mem. in Supp. of Mot. to Dismiss ("Defs. Mem.") at 10.) Without more, the Court has no basis on which to dismiss these claims from the SAC. Accordingly, Defendants' arguments with respect to the retaliation claims are deemed waived and their motion to dismiss the retaliation claims, including all claims alleged by Plaintiff as retaliation for making a charge against MVPD, is denied. *See Lyn v. Inc. Vill. of Hempstead*, No. 03 Civ. 5041 (DRH), 2007 WL 1876502, at *16 n.13 (E.D.N.Y. June 28, 2007), *aff'd*, 308 F. App'x 461 (2d Cir. 2009) ("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . .").

## III.    Disability Discrimination Claim

In order to sustain a claim under the ADA, a plaintiff must show that she has exhausted all available administrative remedies and timely filed a charge with the EEOC before bringing the claim to court. 42 U.S.C. § 2000e-5(f)(1); *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006). Defendants assert that Plaintiff failed to exhaust her administrative

remedies with respect to the Commissioner's denial of her "207 benefits," which they assert requires dismissal of Plaintiff's ADA claim. (Defs. Mem. at 11.)

Whether or not Plaintiff exhausted her claims with respect to the 207 benefits is of no consequence to Plaintiff's ADA claim. Plaintiff's ADA claim, asserted as her fourth claim for relief in the SAC, is decidedly not based on the denial of 207 benefits, but rather arises from the Defendants purported failure to accommodate Plaintiff's request to return to light duty.[5] (*See* SAC ¶¶ 76-81.)

With no other basis asserted on which the Court could dismiss Plaintiff's ADA claim, Defendants motion to dismiss the ADA claim is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Court dismisses Plaintiff's claims for gender discrimination under Title VII, the NYSHRL, and 42 U.S.C. § 1983. The remaining claims are Plaintiff's claim for retaliation and disability discrimination under Title VII, the NYSHRL, 42 U.S.C. § 1983, and the ADA. The Court respectfully directs the Clerk to terminate the motion at ECF No. 28. Defendants are directed to file an answer within 30 days of the date of this Order. The parties are directed to appear for an in-person initial pretrial conference on September 14, 2016, at 12:00pm.


Dated:    July 27, 2016                                    SO ORDERED:
          White Plains, New York

                                                           _____
                                                           NELSON S. ROMÁN
                                                           United States District Judge

---

[5] However, this does not exclude the potential remedy of providing 207-c benefits to Plaintiff for the instant ADA claim. *See Hoffman v. Williamsville School Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) (an allegation not set forth in the charge may not be barred if it is reasonably related to the allegations in the charge and provides EEOC with sufficient notice to investigate the allegation).